NICHOLS *v*. BURCHAM.

1. PARTNERSHIP — EVIDENCE — EXISTENCE OF RELATION — SPECIFIC PERFORMANCE.

Evidence that two brothers owned and dealt in certain lots jointly, that one of them gave to complainant a written option on the joint property, that the brothers advertised as Burcham Brothers, and had stated that they were partners and that they in fact had some business transactions as partners, the copartnership relation not being denied by them on the hearing, *held*, to sustain a decree finding the existence of a partnership.

2. SAME — REAL PROPERTY — POWER OF ONE COPARTNER — VENDOR AND PURCHASER—OPTION.

When the partnership business is to deal in real estate, one of the firm has power as agent for both to execute a contract to convey the joint realty, but it is necessary to show that they had dealings in the land and that the property included in the contract was a part of the property so dealt in.

3. FRAUDS, STATUTE OF—RECEIPT—MEMORANDUM.

A receipt for money paid on the purchase price of land is insufficient as evidence of an executory agreement to sell the land, when it fails to state the times of payment of the unpaid balance.

MOORE, BROOKE, STONE, and OSTRANDER, JJ., dissenting.

Appeal from Iosco; Connine, J. Submitted November 18, 1912. (Docket No. 61.) Decided November 3, 1913.

Bill by Roland A. Nichols against John Burcham, Albert Burcham and Mott Hicks for the specific enforcement of a contract to convey land. From a decree for complainant, defendant Hicks appeals. Affirmed by an equally divided court.

*Edwin Rawden,* for complainant.

*Albert W. Black* and *L. G. Da Foe,* for defendant Hicks.

BIRD, J. The complainant began this proceeding to have a land contract made with defendants Burcham specifically enforced, and to enjoin proceedings at law. The chancellor who heard the case made a decree agreeable to the prayer of the bill, and defendant Hicks has appealed. The land in question consists of 83 acres bordering on Long Lake in Iosco county. The real contest is between the complainant Nichols and defendant Hicks. It appears that both of these parties were nonresidents of the State, and that they began to bargain for the land at about the same time. The title to the land was held by defendants John and Albert Burcham as cotenants. John was living on the premises and Albert was in Illinois. On May 8, 1909, John Burcham gave complainant a written option in the name of Burcham Bros., to purchase the same for $1,000; a payment of $10 being made thereon. This option was duly recorded with the register of deeds for the county of Iosco on the 18th day of May, 1909. On the 19th day of May a land contract was executed by John Burcham in the name of Burcham Bros., agreeing to sell the land to complainant for $1,000, $250 to be paid down and the balance to be paid on or before the 8th day of November, 1909. The down payment was made by the complainant and the land contract recorded in the office of the register of deeds on the 21st day of May, 1909. On or before the day fixed in the contract for the final payment, the complainant made an effort to pay the balance due on the contract, but was unable to do so on account of the absence of the Burchams. The complainant took possession of the premises under his contract, and later a suit in ejectment was commenced against him

by Hicks, to recover possession of the same. Complainant then filed this bill to enforce his contract, and also to enjoin the prosecution of the ejectment suit.

Defendant Hicks' side of the controversy is that on the 3d day of May, five days before the option was given to complainant, John Burcham gave him a written option of purchase of the same premises, with certain lumber thereon for $943, on which he paid him $10. On May 22d John executed a deed of his interest in the premises to him, and on June 14th Albert did likewise, and Albert received one-half of the consideration on June 1st and John received his share on June 14th. It is the claim of the complainant that the defendants Burcham were copartners dealing in lands, and that the execution of the option by John Burcham in the name of the partnership was valid, and that the defendant not only had actual notice that he had made a contract for the purchase price of the land, but that he had constructive notice because of the fact that both the option and the land contract were on file in the register of deeds' office for several days before he made any substantial payment upon the land. The defendant Hicks denies that the Burchams were copartners, and that if they were, the land was not copartnership property, and he denies that he had any actual notice before he purchased that complainant was negotiating for the land. For the purpose of establishing a copartnership between John and Albert Burcham, proof was made that the land was conveyed to them as cotenants, and that they either had it surveyed into lots, or contemplated doing so, and that they established an office on the premises for the sale of them. Upon this office building a sign was placed reading as follows: "Burcham Bros. General and Outing Lots for Sale."

The proofs also showed admissions by each one of the partners that he was in partnership with his

brother in the ownership and sale of these lots. It also appeared that they had entered into some business transactions as partners. The testimony tending to establish the partnership was not disputed by the proofs. No light was thrown on the questions by either one of the Burchams, as neither defended nor did either appear at the hearing. The testimony fairly leads to the conclusion that John and Albert were copartners as to this land.

The more serious question is, however, whether, having established the fact of copartnership, the sale of the land made by John in the firm name was a valid sale as to his brother Albert. To show that John and Albert were partners would not establish the validity of the option as to Albert, unless it was further shown that the copartnership was dealing in lands, and that the lands in question were part of them. *Rovelsky* v. *Brown & Smith*, 92 Ala. 522 (9 South. 182, 25 Am. St. Rep. 83) ; *Ludlow* v. *Cooper*, 4 Ohio St. 1; *Frost* v. *Wolf*, 77 Tex. 455 (14 S. W. 440, 19 Am. St. Rep. 761) ; *Moderwell* v. *Mullison*, 21 Pa. 257; *Chester* v. *Dickerson*, 54 N. Y. 1. (13 Am. Rep. 550) ; *Thompson* v. *Bowman*, 6 Wall. (U. S.) 316; *Batty* v. *Adams County Com'rs*, 16 Neb. 44 (20 N. W. 15) ; *Robinson* v. *Crowder*, 4 McCord (S. C.), 519 (17 Am. Dec. 762) ; 1 Bates on Partnership, §§ 298, 299; 17 Am. & Eng. Enc. Law (1st Ed.), p. 960. See, also, *Moran* v. *Palmer*, 13 Mich. 367.

In *Rovelsky* v. *Brown, supra,* wherein the facts were very similar to the case under consideration, the rule is stated as follows:

" 'When the partnership business is to deal in real estate, one partner has ample power, as general agent of the firm, to enter into an executory contract for the sale of real estate.' *Chester* v. *Dickerson*, 54 N. Y. 1 (13 Am. Rep. 550). 'When real estate is brought into the partnership business, it is treated, in equity, as personal estate, and a lease of it by one partner is

as much a partnership transaction as a sale of partnership goods by him would be.' *Moderwell* v. *Mullison*, 21 Pa. 257. When land is purchased to be dealt in as a commodity, this would seem to be, for the purposes for such dealing, an out and out conversion of it into personalty, and each partner can bind the firm by contracts for its disposition. *Ludlow* v. *Cooper*, 4 Ohio St. 1; *Olcott* v. *Wing*, 4 McLean, 15 [Fed. Cas. No. 10,481]; *Pugh* v. *Currie*, 5 Ala. 446; *Frost* v. *Wolf*, 77 Tex. 455 [14 S. W. 440, 19 Am. St. Rep. 761]; 1 Bates on Partnership, §§ 298, 299. Our conclusion is, that partnership real estate is, in equity and for partnership purposes, to be treated as personalty; and that one member of a partnership, engaged in the business of buying and selling real estate, can bind the firm by contract in the firm name for the sale of partnership land, and that such contract should be specially enforced against all the partners. This conclusion does not involve a disregard of the rule laid down in *Lang's Heirs* v. *Waring,* 25 Ala. 640 [60 Am. Dec. 533]; for the conversion into personalty is only so far as may be called for to effectuate the purposes of the partnership; and when the partnership has come to an end, and its purposes have been fully accomplished, the real estate resumes its legal characteristics."

It is further said in the same opinion that:

"If the several partners in a firm engaged in the business of buying and selling real estate cannot bind the firm by purchases or sales of such property made in the regular course of business, then, they are incapable of exercising the essential rights and powers of general partners, and their association is not really a partnership at all, but a several agency; the acts of each member being subject to ratification or repudiation by the other members, or by their wives, or, if they should die, by their widows, heirs, or devisees. In short, we are unable to discover any satisfactory reason for denying to a court of equity the power to treat real estate as personalty in order to make binding partnership obligations in reference to the particular subject-matter of the regular dealings of the firm, when that rule sought to be invoked to this end is readily applied to enforce the payment of ordinary

debts, or to secure a partnership division, which, as compared with the immediate and primary aim of carrying on the regular business of the concern, are the secondary and ultimate purposes to which the partnership property has been pledged or devoted. And authorities are not wanting to support the conclusion that the rule is not confined in its application by any such unreasonable distinction."

Applying this rule in the law of partnership to the proofs in the case at bar, we think it should be held that John Burcham had the authority to make the contract with complainant, and that it should be enforced against both of the partners.

The chancellor found as a fact that defendant Hicks had actual notice of complainant's contract before he paid any substantial sum on his contract. We think this conclusion was justified by the testimony, notwithstanding it was denied by him. In addition to this, had the defendant taken the precaution to examine the records in the register of deeds' office before he paid the purchase price for his deed, he would have been advised of the option and contract executed by John to complainant.

The defendant Hicks makes complaint because he was denied a rehearing. It appears that he was unable at the hearing to produce the written option given to him by John Burcham on the 3d of May. Subsequently it was found and made the basis of an application for a rehearing. The application was denied by the court because of the apparent lack of good faith in failing to produce the option on the hearing. The receipt reads as follows:

"LONG LAKE, IOSCO COUNTY, MICHIGAN,
"May 4, 1909.
"Description of land purchased of John Burcham and Albert Burcham by Mott Hicks: Beginning thirty-two (32) rods north of the southeast corner of section five (5), thence west to Little Long Lake, then west along said lake and west side of town four (4),

then north to D. & M. Ry., then to lot three (3), then east to two hundred and fifty (250) feet, then north to Big Long Lake, then east along Big Long Lake to section line of section four (4), then south to point of beginning, all lands being situated in lot thirty-eight (38) of section five (5), town twenty-three (23) north of range five (5), east, containing eighty-three (83) acres of land more or less. Received ten dollars ($10) to apply on purchase price of said land, purchase price being nine hundred dollars ($900).

[Signed] "JOHN BURCHAM."

If we were disposed to disagree with the chancellor as to defendant's right to a rehearing, it would be without profit to the defendant, as we are persuaded that the receipt is not sufficient to meet the requirements of the statute of frauds, in that it fails to fix a time when payment should be made. *Gault* v. *Stormont,* 51 Mich. 636 (17 N. W. 214); *Ebert* v. *Cullen,* 165 Mich. 75 (130 N. W. 185, 33 L. R. A. [N. S.] 84), and cases cited.

The decree, canceling defendant Hicks' deed, and providing for a specific performance of complainant's contract, was a proper one, and it will be affirmed, with costs of this court to complainant.

STEERE C. J., and McALVAY and KUHN, JJ., concurred with BIRD, J.

OSTRANDER, J. *(dissenting).* I think there is no testimony warranting the conclusion that the land in question was partnership land. Undoubtedly tenants in common of land who agree to plat it and sell it in parcels have each an interest in each parcel and in the proceeds of its sale. In common speech, they are partners in the matter; that is, are jointly interested. If the tenants in common happened to be brothers, it would be natural to advertise the property for sale, as was done in this case. The brothers carried their bank account in their joint names; that is, in the name of John and Albert Burcham. John Burcham,

who executed the contract under which complainant claims, did not assume the rights of a partner in making the contract, except upon the suggestion of complainant. In view of the opinion of Mr. Justice BIRD, it is proper to set out the testimony presented on the part of complainant upon the subject of a partnership in this land. He drew the original option. At the time he drew it, John Burcham had agreed, not so that his agreement could be enforced, but had given his personal promise in writing, to sell the land to defendant.

As stated, complainant drew the original option taken by himself. When it was offered in evidence, certain changes and interlineations were called to the attention of the court, as follows:

"The option notified complainant that land was owned jointly. I desire to call the court's attention to it. The words, 'I, John Burcham,' in the first line is crossed out and after the word 'Burcham' in the third line it says, 'Brothers,' which was inserted in there after original option had been made, whatever time that might be. Also that original option, as originally drafted, did not contain the words 'Said farm belonging jointly to Burcham Brothers, partners.' It was inserted in there after the original option was drawn, whatever time that might be. That notified complainant of the joint ownership."

Thereupon complainant testified:

"*Q.* Attention has been called to certain interlineations in original option; who made those?

"*A.* They were made by myself before signing by either, and after I read over all the corrections; we were in a hurry and did not have time to recopy it before both signing."

Complainant further gave testimony as follows: On direct examination:

"*Q.* Now, in your conversation with John Burcham, what, if anything, did he say as to he and his brother being in partnership in regard to this land?

"*A.* He said they were partners. * * * This conversation occurred when I first looked over the farm, and was again repeated on the cars in the presence of Mr. Crary, as to partnership and his authority to make sale. * * *

"*Q.* State as near as you can the conversation that you had on this 19th day of April [the day the contract was presented to John for execution].

"*A.* He passed the time of day. I said I had been watching for him. He was not at home when I got there. He said: 'Well, I don't know about this; I don't know.' I said: 'I am prepared to carry out my part of the option.' Then he said: 'Well, my brother is not willing; I have seen my brother, and he is not willing.' I said, 'Well, you are a partnership, and you did the business for the firm, and I am prepared to carry out my part of the agreement for the land contract, and I shall expect you to.'"

On cross-examination, he testified as to what took place before the option was given:

"*Q.* At that time he told you that he and his brother owned this land jointly?

"*A.* He said they were partners.

"*Q.* Answer my question.

"*A.* Yes, sir.

"*Q.* At this time he told you that he and his brother owned this land jointly? Answer that, 'Yes' or 'No.'

"*A.* I have not enough knowledge of law to know whether jointly or a partnership or both.

"*Q.* Did he tell you in this conversation that he and his brother owned that land jointly?

"*A.* I think he did. I do not recall exactly the words in which he stated it.

"*Q.* At that time you had not made any examination of the records?

"*A.* No, but before I did anything farther, I investigated the title and found that record title showed that land belonged to John Burcham and Albert Burcham. There was nothing stated in the deed showing they were copartners. I knew what the record title showed before I did anything farther."

As to what took place at the time the land contract was executed:

177 Mich.—39.

"*Q.* In that conversation he said to you then and there that he did not know about selling this land to you? Answer that by 'Yes' or 'No.' He said to you, 'Don't know about selling this land.'

"*A.* He said, 'I don't know about selling this; I don't know what to do.'

"*Q.* Did he or did he not make such a statement?

"*A.* He said, 'I don't know about this.' Yes.

"*Q.* Now, I want a direct answer to my question, and don't want you to be evasive; he told you in that conversation, 'I seen my brother, and he is not willing to sell the land?'

"*A.* Yes. We remained out by the fence until Mr. Rawden and Mr. Ballard came up with the boat.

"*Q.* Now, in that conversation with Mr. Burcham you told him that he did have a right to sell that land for his brother, whether he was willing or not?

"*A.* Is that a question?

"*Q.* Yes.

"*A.* I told him that he would if they were partners; he had the right, or the agent, to sell that land, as a partner.

"*Q.* To sell the land whether the brother was willing or not?

"*A.* To sell the land.

"*Q.* Didn't you tell him whether his brother was willing or not?

"*A.* I don't recall.

"*Q.* You don't know whether you did or not?

"*A.* I told him he was the agent, and he was doing business for the partnership, and he would have the right under the option to sell the land.

"*Q.* Did you in that conversation tell him that he had that right, whether his brother was willing or not; answer that 'Yes' or 'No.'

"*A.* I don't recall exactly the words. * * *

"*Q.* So that you did have a knowledge that there was some unfairness or some weakness in closing up the deal before you had it closed up?

"*A.* Yes.

"*Q.* When did you first learn of that unfairness?

"*A.* By the look of Mr. Eymer's letter head sent me by Burcham.

"*Q.* Where is that letter?

"*A.* I have it in the files somewhere unless you (meaning Mr. Rawden), have it.

"*By Mr. Rawden:* I don't think I have it. That was a letter from John Burcham. The first one reached me at Hiram within two or three days after leaving Michigan. I should say three or four days after obtaining option.

"*Q.* Then you received a communication from Mr. Burcham in regard to this matter, and that he could not make the deal, as there was some unfairness?

"*A.* He did not say that he could not make the deal, but that he did not want to make the deal, and wanted to give me my money back. The reason he gave for not wanting to make the deal was that he had seen his brother and he did not want to sell.

"*Q.* So that three or four days after receiving this option he notified you that he had seen his brother that owned the land jointly with him, and that he was not willing to sell?

"*A.* Yes.

"*Q.* And that brother was Albert Burcham?

"*A.* Yes.

"*Q.* And you did not see Mr. Burcham personally again until you came here at the date of Exhibit B (the contract)?

"*A.* No, sir.

"*Q.* And he immediately told you then that he had seen his brother, and he was not willing to sell?

"*A.* Yes."

After executing the contract, Burcham, or some one for him, sent to complainant, by express, the $260 he had paid, and complainant refused to receive the package.

Complainant's witness Crary testified:

"*Q.* Did you hear at that time Mr. John Burcham say anything as to whether he and his brother were in partnership as to that land?

"*A.* Yes.

"*Q.* What did he say?

"*A.* Well, now in the first place this was prior to going down on the train.

"*Q.* What did Mr. John Burcham say regarding he and his brother being in partnership in those lands?

"*A.* He said it on his property first, and afterwards going down on the train. I think it was after we got to the depot.

"*Q.* Was that before the execution of this option, Exhibit A?

"*A.* Yes.

"*Q.* Did you ever hear Albert say anything about the fact of there being any partnership, or not being in partnership, in anything?

"*A.* Not in regard to the land. I did in regard to handling vegetables and stuff on their property.

"*Q.* But you say you never heard Albert say anything in regard to the land?

"*A.* No, sir. * * *

"*Q.* Taking the conversation you had with Albert Burcham in consideration, Albert Burcham never told you at any time that he was a partner of John Burcham in the land business?

"*A.* No, sir. I don't think I ever talked with Albert about it."

Complainant's witness Beedon, who was cashier in a local bank, testified: Direct examination:

"I had a conversation with Albert Burcham regarding this business of theirs at Long Lake and the purchase of that land up there.

"*Q.* Now, what, if anything, did he say to you as to the relation that he bore to his brother in regard to that land? * * *

"*A.* They were partners all the time in their land deals, and generally split the profits, always in all of their deals that they had around town there; they figured around a good deal in farms and lots, and they always split the profits, and Albert—he is a little more simple than the other fellow—he asked me if I thought it was a good deal that they traded their farm for that property at Long Lake. I wasn't much acquainted with the country at that time; I told him I didn't know much about it.

"*Q.* What I want is what Albert said to you in regard to how he and his brother had gotten into that deal at Long Lake, and if they were partners. * * *

"*A.* He told me that they were going to trade for this land and make it into a summer resort, and they

were going to plat it and sell the lots and each take the profits on what they could sell it for.

"*Q.* Did he make any statement to you as to whether he and John were partners in the business? * * *

"*A.* Yes, he did.

"*Q.* What did he say about that?

"*A.* Well, he said that they were—that he was trying to get it—when he started they would buy and sell these lots and each take their share. * * *

"*Q.* What, if anything, did John say as to how he and Albert were in that venture up there?

"*A.* He said they were going to be partners in the venture. I think he said this after they had gone into it. After they moved up to Long Lake, what little banking they did, they continued to do it in our bank.-

"*Q.* Now, can you give us, as near as you recall it, the conversations or statements that Albert made to you when you say that he stated they were partners in the business?

"*A.* He made the statement to me that they were going to try and sell these lots and make some money and pay for the rest of the place. It seems to me there must have been a little something back of it. I never asked them, but they wanted too big a price for the lots, or else they would not sell them.

"*Q.* What, if anything, did he say as to the division of the profits?

"*A.* Just as much as John—just the same."

Cross-examination:

"I knew Albert Burcham about three years. He was real often in our bank. The conversation I have just related took place after the purchase of the Long Lake property. I can't tell the exact time. It took place in the bank. Don't remember of any one else being present but myself and Albert Burcham. The way he come to tell me, we got talking about the property. John Burcham was not there at that time.

"*Q.* Now, give us the words, as near as you can as to what Albert Burcham said, not your language, but his.

"*A.* He said they were going to live up there and move up there and build a shanty.

"*Q.* Did he say 'They' or 'We?'

"*A.* He said 'We,' I think. 'We are going to move up there and have this land surveyed and make lots and sell the lots for outing ground purposes.'

"*Q.* Now, then, you know as to whether they owned the land at that time?

"*A.* They had it bought at that time.

"*Q.* Do you know whether or not they surveyed it or had it platted into lots at that time?

"*A.* I think not.

"*Q.* Do you know as to whether they ever had it surveyed into lots?

"*A.* I think it is.

"*Q.* Of your own knowledge?

"*A.* I think they did.

"*Q.* Do you know of your own knowledge?

"*A.* I could not swear to it.

"*Q.* Is that the only conversation you ever had with Albert regarding that land?

"*A.* I think it is.

"*Q.* What you have told me just now is all that Albert Burcham said to you at that time regarding that transaction?

"*A.* No; I would not say that he didn't, because I have probably forgotten something—that is, a part of it. I have known John Burcham about the same length of time, and he did business with our bank. They had at times a little money deposited in bank.

"*Q.* When did you have a conversation with John regarding the matter?

"*A.* Before they bought it and after they bought it.

"*Q.* What did he say in that conversation—his words as near as you can remember?

"*A.* He came there and asked me if I thought it would be a good deal; that is, if I thought they could make any money, and I told him I could not judge about it because I was not acquainted with that part of the country.

"*Q.* Then what did he say?

"*A.* I think he said that he was going to take it up anyway.

"*Q.* Then what else did he say?

"*A.* That is all that I can remember of him saying.

"*Q.* That is the first conversation; now the second conversation. When did you have that?

"*A.* It was after he had made a deal for the land; I can't tell how long after he bought the land the second conversation occurred. I believe the second conversation occurred at the bank.

"*Q.* Using John's language, what did he say?

"*A.* He said they had purchased that land up there, and they were going to have it surveyed and platted into lots.

"*Q.* He did not tell you at that time that he had had the survey made and the land put into lots?

"*A.* No; he did not.

"*Q.* All the conversation with John was in regard to something that was to be done in the future?

"*A.* Yes, sir.

"*Q.* What else did he say, if anything?

"*A.* I could not think of anything more that he said up there.

"*Q.* Does that contain then, all the statements made by John Burcham to you at that conversation, as near as you can remember them?

"*A.* Yes, sir; it does.

"*Q.* And this second conversation, I take it, was the last conversation that you had with John Burcham concerning the matter?

"*A.* I think it was.

"*Q.* That was all the conversation?

"*A.* Yes, sir.

"*Q.* Then you did not talk with him or with Albert after any arrangement had been made by them to sell these lots, if such arrangements were made?

"*A.* No.  *  *  *

"*Q.* Did John and Albert Burcham have an account in your bank?

"*A.* They had at different times a little money on deposit. The account was in the name of John and Albert Burcham. There was no account in bank placed by either of the Burchams in the name of Burcham Bros."

Complainant's witness Ballard: Direct examination:

"I know John and Albert Burcham. I knew them for about two years before I moved to Long Lake. They did some business in my store. They purchased goods from me and also small fence posts and saw

logs, after they came to Ellake. (Ellake and Long Lake are different names for the same place.)

"*Q*. During the time that they came into the store, did you have any conversation with either of these men, either John or Albert, as to the relation they bore to each other in that piece of land, or in the business that they were engaged in up there? *  *  *

"*A*. Only so far as when they were making a purchase or fetching in material that I bought of them, and it would not be paid for at that time, they would wait until either of them came in to pay it up, or occasionally when I bought anything of them I would deduct it until they got ready to settle up. That was the only time that I had any conversation with them in regard to their partnership business or anything of that sort. *  *  *

"*Q*. Now, what statement did Albert Burcham make to you at any time regarding the relation that he bore to his brother in that land that they had down there at Long Lake?

"*A*. The statement that he made to me was the first time that I had anything much of a talk. I asked him the first time, I said, 'You are Albert Burcham,' and he said, 'Yes, but don't put it down that way; put it down to Burcham Bros. as John and I are partners.' *  *  *

"*Q*. Now, when he brought logs or fence posts down there (referring to Albert), did he at any time make statements when he brought any such forest products, regarding any relations that he bore to his brother and this land? *  *  *

"*A*. I could not say that Albert personally did. I don't think that Albert himself fetched me any timber at any time. When there was anything of that sort John generally attended to the timber end of it."

On cross-examination:

"Albert Burcham never told me anything about any relations which existed between him and John, except when he came and got goods in the store and stated to me that he got it for Burcham Bros. in that they were partners. They were living together at that time. I let them have some things out of the grocery store, such as groceries and clothing, that would be likely to be used by both parties; also tools and saws.

\* \* \* At no time was there a general discussion entered into by me with these parties as to their exact relation, so far as this piece of property is concerned; in other words, we did not enter into private affairs, and I did not ask them about where they stood in regard to this piece of property, except as is stated in conversation above referred to, and these conversations took place at the ⟨-store with Albert Burcham. Albert Burcham never ⟨afterwards talked with me about any partnership existing between him and John as regards this piece of land. John talked to me about the partnership business in the property along that same winter; I think it was in the winter of 1908. He was in the store three or four times a week.

"*Q.* What did he say?

"*A.* When I seen him, in particular that I remember, he was there with a load of logs, and he wanted me to go down and scale them, and I took the scale sheet down there and he stood and looked over my shoulder as I wrote the scale down on the sheet, and I wrote 'John Burcham,' and he corrected me and he said the logs—that is, partnership—it · is 'Burcham Bros.,' in that way.

"*Q.* That entire matter referred to the timber that had been cut by the two boys, the two Burcham boys, and necessarily would be a partnership matter?

"*A.* Yes.

"*Q.* That did not refer to the matter of the land in any way, did it?

"*A.* That didn't as I know of, any more than that the logs came off the land.

"*Q.* What other time did you talk with him regarding the matter?

"*A.* It was common conversation in regard to their business. I could not tell you the dates. The next time that directed my attention that John Burcham said anything to me about the partnership relation to this land was when I made a trade with John for a lot he had in Hale, and he was trading some stuff at the store, and he bought a whole lot of stuff, and I made a trade with him, and he said, 'I will fetch up Albert and see if he is satisfied,' so him and Albert came up that night, and he closed the deal.

"*Q.* He did not tell you then that he was trading

you that lot down there, or sign 'Burcham Bros., by John Burcham,' and Albert not come near it?

"*A.* No, sir. He did not tell me that. Albert came up to look the situation over with John."

Complainant's witness Hadwin, as to what occurred when the contract was executed:

"The conversation that I heard between Mr. Nichols and Mr. Burcham about this contract was that Mr. Nichols said that he came there to make that payment on the property, and Burcham said: 'Well, I don't know about that; my brother is not here.' Mr. Nichols said: 'Well, you are agent for your brother in this business'—and he said: 'Yes, sir.' 'Well,' he said, 'You can sign it yourself. You are acting as his agent.' "

This is, I think, all the testimony of witnesses upon the subject of the partnership. In addition, it appears that upon the land were signs advertising the fact that outing lots were for sale by Burcham Bros., and upon a building of one room, upon the land was a paper sign bearing the words, "Burcham Bros. General and Outing Lots for Sale." I conclude there was no proof of a partnership agreement of the Burchams with respect to the land; none that it was purchased by them with partnership funds; none that Albert Burcham ever held his brother John out as his partner with respect to the lands, or that either, except in the particular matter, ever assumed to deal with the lands as partnership property. It is clear, I think, that John Burcham never supposed that he was in fact the partner of his brother, entitled, by virtue of their agreement, to make contracts with respect to the sale of the land. The suggestion came from complainant, who assumed, upon the facts disclosed to him, to advise him that he had the right to make the option, and later advised him that he had the right to make the contract. The land was not sold in parcels, but as an entirety. Complainant was notified when he had but $10 invested that John Burcham

wished to withdraw the option. On the other hand, the defendant Hicks, apparently in good faith, accepted from John Burcham, on May 4, 1909, four days before complainant received his option a memorandum, set out in my Brother BIRD'S opinion. Pursuant thereto there was executed a deed of the land by both John and Albert Burcham. The deed is dated May 15, 1909, but was actually acknowledged, by Albert, in Illinois, May 22, 1909, and by John, in Michigan, June 14, 1909. Defendant Hicks paid the purchase price, and personally took possession of the land. He was evicted in June, 1909, by an agent of complainant, who had not then paid the balance of the purchase money on his contract, and has never paid it, and to whom the money he had paid was before then attempted to be returned. Complainant is entitled to no particular sympathy or equitable consideration. He determined for himself that the land was partnership land, and that John could bind the partnership by his agreement. He stood, and stands, upon a strict legal right. He must establish the fact that the land was partnership property or must fail. My own reasons for concluding that he has not done so sufficiently appear. I think it will be a distinct departure in the law if it is held that the evidence is sufficient to prove a partnership agreement with respect to this land between John and Albert Burcham, or that the land was purchased with partnership funds, or that Albert Burcham or John Burcham ever held himself or his brother out as such a partner.

The decree should be reversed, and one should be entered granting the relief prayed for in the cross-bill, with costs of both courts to defendant Hicks.

MOORE, BROOKE, and STONE, JJ., concurred with OSTRANDER, J.